UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

AJAY SARASWAT,

                    Plaintiff,

        - against -

BUSINESS INTEGRA, INC. and JAGAN
PARATHASARTHY,

                    Defendants.

------------------------------------------------------------x

**MEMORANDUM & ORDER**
15-CV-4680 (PKC) (LB)

PAMELA K. CHEN, United States District Judge:

Plaintiff Ajay Saraswat ("Plaintiff") filed a complaint on August 10, 2015 (Dkt. 1) and an amended complaint on November 16, 2015 (Amended Complaint ("Am. Compl."), Dkt. 11), alleging various claims against Defendants Business Integra, Inc. and Jagan Parathasarthy (collectively, "Defendants").[1] Before the Court are Defendants' motion for summary judgment (Dkt. 74), Defendants' motion for sanctions (Dkt. 75), and two motions *in limine* (Dkts. 57, 76). For the following reasons, Defendants' motion for summary judgment is granted, Defendants' motion for sanctions is denied, and the motions *in limine* are denied as moot.

## BACKGROUND

Plaintiff's family moved from New Delhi, India to Queens, New York in 2000. (Defendants' 56.1 Statement ("Defs.' 56.1"),[2] Dkt. 74-8, ¶ 12; Plaintiff's Deposition ("Pl.'s

---

[1] Though Selva Jayaraman and Pratibha Ramdoss were initially identified as defendants, they were dismissed from the lawsuit at the motion-to-dismiss stage. *See Saraswat v. Jayaraman*, No. 15-CV-4680 (PKC) (LB), 2016 WL 5408115, at *7 (E.D.N.Y. Sept. 28, 2016) (adopting Report & Recommendation's conclusion that Selva Jayaraman and Pratibha Ramdoss should be dismissed from the case for lack of personal jurisdiction).

[2] Unless otherwise noted, a standalone citation to a party's 56.1 Statement denotes that this Court has deemed the underlying factual allegation undisputed. Any citation to a party's 56.1

Dep."), Dkt. 77-1, at ECF[3] 2132.) After moving to the United States, Plaintiff obtained an F-1 student visa[4] and attended Vaughn College of Aeronautics, where he graduated with a B.S. in aviation maintenance and an associate's degree in aeronautical engineering technology. (Defs.' 56.1, Dkt. 74-8, ¶ 14; Pl.'s Dep., Dkt. 77-1, at ECF 2139.) Plaintiff also received a master's degree in mechanical engineering from the City University of New York ("CUNY") in September 2005. (Defs.' 56.1, Dkt 74-8, ¶ 15; Pl.'s Dep., Dkt. 77-1, at ECF 2140.) Plaintiff then acquired an Optional Practical Training ("OPT") visa[5] from the City College of New York[6] and attempted to secure employment. (Defs.' 56.1, Dkt. 74-8, ¶ 16.) Plaintiff worked for one month at AAR Allen Studio Radio Service, but "didn't like it" and "just left the job because it wasn't something [he] wanted to pursue." (*Id.* ¶ 17; *see also* Pl.'s Dep., Dkt. 77-1, at ECF 2140–41.) Thereafter, Plaintiff

---

Statement incorporates by reference the documents cited therein. Where relevant, however, the Court may cite directly to the underlying document.

   With the exception of facts that go to Plaintiff's subjective state of mind, the Court has deemed facts averred in Defendants' 56.1 Statement to which Plaintiff cites no admissible evidence in rebuttal as undisputed. *See Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 12, 2012) ("Eastern District Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything.").

   [3] "ECF" refers to the "Page ID" number generated by the Court's CM/ECF docketing system and not the document's internal pagination.

   [4] An F-1 visa is issued to an alien for the purpose of pursuing a course of study at, *inter alia*, a college or university. *See* 8 C.F.R. § 214.2(f)(1)(i).

   [5] A student may apply for an OPT visa when he or she is engaged in "temporary employment for optional practical training directly related to the student's major area of study." 8 C.F.R. § 214.2(f)(10)(ii)(A).

   [6] City College of New York is one of CUNY's 24 institutions and its "flagship." *See About: Our History*, The City College of New York, https://www.ccny.cuny.edu/about/history (describing CUNY as "the largest public urban university system in the United States, . . . consisting of 24 institutions, including its flagship, City College") (last visited Apr. 24, 2019).

applied to some defense firms, but was unable to obtain a job because he was not a U.S. citizen. (Defs.' 56.1, Dkt. 74-8, ¶ 18; Pl.'s Dep., Dkt. 77-1, at ECF 2141.) Plaintiff then decided to pursue a graduate degree at Brooklyn Polytechnic Institute, now known as the Tandon School of Engineering at New York University. (Defs.' 56.1, Dkt. 74-8, ¶ 19; Pl.'s Dep., Dkt. 77-1, at ECF 2141.)

In March 2007, Plaintiff attended a job fair at Brooklyn Polytechnic Institute, where he met Defendant Parathasarthy, who was at the job fair representing Defendant Business Integra, Inc. ("Business Integra" or "BI"). (Defs.' 56.1, Dkt. 74-8, ¶ 21; Pl.'s Dep., Dkt. 77-1, at ECF 2153–54.) Shortly after the job fair, on or about March 26, 2007, Defendant Parathasarthy and Plaintiff spoke on the phone, after which Defendant Parathasarthy sent Plaintiff an email stating: "I was under the impression that you wanted to complete the MS in Financial engineering. Your phone call today has clarified that you wanted us to sponsor your H[-]1B[7] immediately." (Defs.' 56.1, Dkt. 74-8, ¶ 22; Plaintiff's Declaration in Opposition to Summary Judgment & Exhibits in Support ("Pl.'s Exs."), Dkt. 77-5, at ECF 2403–04.) That same day, BI emailed Plaintiff an offer letter. (Defs.' 56.1, Dkt. 74-8, ¶ 22.) Additionally, Defendant Parathasarthy sent Plaintiff an email stating: "We also need OPT/CPT [Curricular Practical Training] from your University where you

---

[7] An H-1B visa is a temporary work visa that is available to individuals who work in a specialty occupation. *See* 8 C.F.R. § 214.2(h)(1)(ii)(B)(1). An H-1B visa provides a nonimmigrant alien entry to the United States for an initial period of no more than three years. 8 C.F.R. § 214.2(h)(9)(iii)(A)(1). This visa "may be extended for a period of three years, but an individual may not remain in the United States on an H-1B visa for more than a total of six years, unless the alien has an approved or pending labor certification application for at least one year." *Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 432 (E.D.N.Y. 2013); *see also* 8 C.F.R. § 214.2(h)(15)(ii)(B)(1). To obtain an H-1B visa, the individual must have an employer sponsor the visa application and, if the visa is granted, the individual is legally required to work for that employer pursuant to the visa. *See Burrell v. City Univ. of N.Y.*, 995 F. Supp. 398, 403 n.2 (S.D.N.Y. 1998). As discussed *infra*, if the individual wishes to work for a new or different employer, he must again go through the process of obtaining an H-1B visa sponsored by that employer and authorizing the individual to work for the new or different employer.

did Mechanical Engineering or from Poly where you are doing Financial engineering allowing you to work[,] as F1 visa holders can work only under these conditions. Otherwise you can start working only after H[-]1B is granted." (Defendants' Exhibit ("Defs.' Ex.") G, Dkt 74-5, at ECF 1492.) The record is unclear as to whether Plaintiff ever provided his OPT and/or CPT materials to BI.[8] On March 26, 2007, Plaintiff signed the offer letter (Defs.' 56.1, Dkt. 74-8, ¶ 23), which the Court will refer to as the "OPT Contract."

The OPT Contract explained that BI was offering Plaintiff a position as a mechanical engineer to begin on April 16, 2007. (Defs.' Ex. H, Dkt. 74-5, at ECF 1494.) It provided that: "For purposes of this agreement you will be deemed to have 'commenced your employment' with [BI] as of the date o[n] which you commence a project and provide billable services on behalf of

---

[8] According to Defendants' 56.1 Statement, "Defendants requested that Plaintiff send them his OPT visa information, which would [have been] needed for Plaintiff to actually perform work before his H-1B visa was approved." (Defs.' 56.1 ¶ 36 (citing March 26, 2007 email from Defendant Parathasarthy to Plaintiff requesting OPT information).) But neither Defendants nor Plaintiff have presented evidence verifying that Plaintiff actually provided his OPT visa information to Defendants. To the contrary, Plaintiff stated as follows at his deposition:

> [Defendant Parathasarthy] asked me like do you have an OPT or CPT? I said no, I don't have it. And he said then my company has to sponsor a[n] H[-]1[B] work visa for you. I knew what an H[-]1[B] work visa is, but I didn't—I don't know that—what the regulations are or something like that, but I know to work [in the United States], you need a work visa, as a layman, I knew that. And I've always been in the university through all these seven years. So, he said can you obtain an OPT or CPT? I have e-mails of him, too, and I forwarded it to you. I said no, I cannot obtain it because it's my second semester here, so he send[s] me a job offer letter on 26th of March . . . . Conversation finished right there. Do you have OPT, CPT? No. Then he said we have to file an H-1B for you, I said okay. The end.

(Pl.'s Dep., Dkt. 77-1, at ECF 2155.) For the reasons discussed, *infra*, the Court determines that Plaintiff's claims fail regardless of his immigration status during the events at issue in this case. The Court therefore regards the resolution of this factual issue as irrelevant for purposes of summary judgment. *See Anilao v. Spota*, 340 F. Supp. 3d 224, 237 n.9 (E.D.N.Y. 2018) (disregarding "factual disputes" that were "not material to the Court's analysis for the purposes of the summary judgment motion").

[BI]." (*Id.* at ECF 1494; Defs.' 56.1, Dkt. 74-8, ¶ 24; Pl.'s Exs., Dkt. 77-5, at ECF 2426.) The OPT Contract further provided: "You understand that your employment requires you to perform services at customer sites, and you may be required to travel and/or relocate to perform such services." (Defs.' 56.1, Dkt. 74-8, ¶ 25; Pl.'s Exs., Dkt. 77-5, at ECF 2426.) The OPT Contract called for a 70/30 split for compensation between Plaintiff and BI, respectively, and specifically provided: "You will be compensated 70 percent of bill rate on W2 currently paid on bi-weekly basis." (Defs.' 56.1, Dkt. 74-8, ¶ 26; Pl.'s Exs., Dkt. 77-5, at ECF 2426.) Additionally, the OPT Contract provided that the employment would be on an "at-will" basis. (Defs.' 56.1, Dkt. 74-8, ¶ 27; Pl.'s Exs., Dkt. 77-5, at ECF 2426.) Although Plaintiff did not read the OPT Contract in full, he did read the part establishing the 70/30 split and was "pretty much comfortable that [he] was making good money." (Defs.' 56.1, Dkt. 74-8, ¶ 29; Pl.'s Dep., Dkt. 77-1, at ECF 2159.) The OPT Contract obligated Plaintiff to apply for an H-1B visa, with BI as the sponsoring employer, so that he could legally work in the United States for BI:

> H-1B approval: You understand and acknowledge that your employment by Business Integra may commence once your H[-]1B petition is filed. You further understand and acknowledge that if your H-1B petition is denied, then, under the law, your work authorization ceases and you are required to depart the United States. As such, your future employment by Business Integra is subject to the final approval of your H-1B petition and such employment with Business Integra must be terminated upon the denial of your petition.

(Defs.' Ex. G, Dkt. 74-5, at ECF 1495.) At the time Plaintiff signed the contract, he did not feel that he was being forced to assent to the contract's terms. (Defs.' 56.1, Dkt. 74-8, ¶ 31; Pl.'s Dep., Dkt. 77-1, at ECF 2184.) Plaintiff agreed to pay BI $2,000 as a security deposit in the event that he decided to apply for an H-1B with another company instead. (Deposition of Selva Jayaraman ("Jayaraman Dep."), Dkt. 77-3, at ECF 2314.)[9] Accordingly, Plaintiff gave BI a check for $2,000

---

[9] At deposition, Mr. Jayaraman described the purpose of the security deposit as follows:

around the time he signed the OPT Contract. (Defs.' 56.1, Dkt. 74-8, ¶¶ 33, 34; Pl.'s Dep., Dkt. 77-1, at ECF 2162.)

Over the next several months, Defendant Parathasarthy sent engineering job openings to Plaintiff and suggested that Plaintiff apply to them so he could gain experience in advance of his H-1B permit approval in the fall. (Defs.' 56.1, Dkt. 74-8, ¶ 37.) Plaintiff was under the impression that BI was looking for an OPT/CPT placement for him. (Id. ¶ 38.)[10] When presented with a mechanical engineering position in Illinois, Plaintiff declined. (Id. ¶ 40.) Subsequently, BI presented Plaintiff with an engineering analyst position in Wisconsin. (Id.) Additionally, BI asked Plaintiff to find jobs that BI could pursue on Plaintiff's behalf, and although Plaintiff did find jobs, he did not forward them to BI. (Id. ¶ 41.) Although Plaintiff understood that BI was looking for

---

[I]t's a deposit collected I guess as a security, because those days it was a common practice that, you know, students were applying [to] H[-1B] with multiple companies. . . . We being a small company, we need to make sure that our investments are going in a right direction, and H-1B is a lot of intake for a company to invest. . . . So we have to make sure that we invest properly. And, you know, we—we collected security deposits to make sure that, you know, our investment[] is not going to waste. . . . [T]he security deposits are only collected if we do not know he or she or if they didn't come from, you know, a proper known source. . . . And it was always [given back to them] the moment they became an employee. . . . [T]he security deposits are only collected for those whom we do not have any— come from a known source, are, you know—it's—it's a risk to the company because you know, we are—we're investing a lot on applying and preparing and going through that the USCIS and secure the H-1B.

(Jayaraman Dep., Dkt. 77-3, at ECF 2314–15.)

[10] Plaintiff admitted at deposition that he did not apply for any of these job openings based on the belief that "until [his] H[-]1B [wa]s approved, there [wa]s no use of Business Integra [and Defendant Parathasarthy] throwing these so-called job opportunities at [him] because [he] [could not] work." (Defs.' 56.1, Dkt. 74-8, ¶ 39; Pl.'s Dep., Dkt. 77-1, at ECF 2174.)

jobs on his behalf (*id.* ¶ 42), he could not remember whether he ever told Defendant Parathasarthy that he believed he could not work until his H-1B visa was granted (*id.* ¶ 43).[11]

On September 12, 2007, Plaintiff's H-1B application was approved. (*Id.* ¶ 46.) The H-1B visa was sent to BI, as the sponsoring employer. (Defs.' Ex. J., Dkt. 74-5, at ECF 1515.) On or about October 5, 2007, BI sent Plaintiff a new offer letter and contract (the "H-1B Contract"), which Plaintiff promptly signed. (Defs. 56.1, Dkt. 74-8, ¶ 48.) The H-1B Contract provided that Plaintiff would serve as a mechanical engineer at BI's division in Greenbelt, Maryland "with effect from October 1st, 2007" (Pl.'s Exs., Dkt. 77-6, at ECF 2430), and would be compensated with an annual salary of $55,000 (Defs.' 56.1, Dkt. 74-8, ¶¶ 49–51). The H-1B Contract specifically stated that Plaintiff's "employment will commence only upon [Plaintiff's] reporting to [BI's] office in the United States, or to the first assignment location." (*Id.* ¶ 52; Pl.'s Exs., Dkt. 77-6, at ECF 2430.) At the time, Plaintiff was aware that BI planned to assign him to client sites. (Defs.' 56.1, Dkt. 74-8, ¶ 54.) Like the OPT Contract, the H-1B Contract provided that Plaintiff was employed on an "at-will" basis. (*Id.* ¶ 55; Pl.'s Exs., Dkt. 77-6, at ECF 2430.) The H-1B Contract also contained a merger clause providing that "[t]his agreement constitutes the complete agreement for employment between you and [BI] and may not be amended or modified unless signed in writing by both parties." (Defs.' 56.1, Dkt. 74-8, ¶ 56; Pl.'s Exs., Dkt. 77-6, at ECF 2435.) Plaintiff understood that, under the H-1B Contract, he would receive a salary of $55,000 annually and would *not* be paid based on a 70/30 split of his bill rate. (Defs.' 56.1, Dkt. 74-8, ¶ 58.) Finally, the H-1B Contract set forth the following provisions regarding Plaintiff's compensation:

> As compensation for all of the services to be rendered by Employee [Plaintiff] pursuant to the terms and conditions set forth herein, and such other duties as

---

[11] At his deposition, Plaintiff admitted that he "could have" declined employment at BI during the time period in which Defendant Parathasarthy asked Plaintiff to post his resume on job sites and apply for jobs. (Defs.' 56.1, Dkt. 74-8, ¶ 44; Pl.'s Dep., Dkt. 77-1, at ECF 2177.)

Company [BI] may from time to time determine necessary, Employee shall receive a base salary of Fifty[-]Five thousand Dollars ($55,000) per year, paid semi-monthly.

    i.    If Employee secures a consulting assignment by himself/herself for his/her services as Company's Employee, then employee shall receive 75% of his/her billed amount as total compensation. The total compensation as defined in the preceding sentences shall include salary and cost of all benefits provided by Company. The difference between his/her base salary and 75% of the billed amount, after accounting for all the benefits received will be settled every three months, after Company has received payment from the client for the concerned hours. The calculations will be further reviewed on an annual basis, to ensure that the correct amounts are being paid. Employee is not entitled to receive any compensation beyond the regular salary and standard benefits, unless and until client pays for the hours that Employee has worked.

    ii.    However, if Employee provides service on a consulting opportunity through Company's marketing efforts, then the rate of compensation for Employee will be 70% of the billed amount with all other conditions same as clause (i) above.

(Pl.'s Exs., Dkt. 77-6, at ECF 2431; *see also* Defs.' 56.1, Dkt. 74-8, ¶ 59.)[12]

After signing the H-1B Contract, Plaintiff submitted a letter dated November 7, 2007 stating: "personal, leaving to Maryland for short term" and "expected return date, Spring 2008." (Defs.' 56.1, Dkt. 74-8, ¶ 60; Pl.'s Dep., Dkt. 77-1, at ECF 2186.) Plaintiff never reported to BI's Greenbelt office, never performed any work at customer sites on behalf of BI, and never left New York. (Defs.' 56.1, Dkt. 74-8, ¶¶ 61–63.)

_____

[12] Although both Plaintiff and Defendants appear to have been under the impression that Plaintiff could legally receive compensation from another company for performing a "consulting assignment" while on an H-1B visa to work at BI, it is not clear that such an arrangement is legal and/or enforceable. *See* 8 U.S.C. § 1184(n)(1); *see also Burrell v. City Univ. of N.Y.*, 995 F. Supp. 398, 403 n.2 (S.D.N.Y. 1998); *Ali v. Mukasey*, 542 F.3d 1180, 1182 (7th Cir. 2008) (holding that non-citizen was deportable for failing to comply with the conditions of his H-1B visa where non-citizen commenced work for different employer than the one specified on his original H-1B application). Because this issue is irrelevant for purposes of summary judgment, the Court does not rule on the propriety of such an arrangement. *See Anilao*, 340 F. Supp. 3d at 237 n.9.

Around this time, Plaintiff interviewed for a job at "Caterpillar/Voltservices," where he received a "potential job offer." (Defs.' 56.1, Dkt. 74-8, ¶ 65; Pl.'s Dep, Dkt. 77-1, at ECF 2216.) Plaintiff subsequently received a job offer from a company called "RSD Engineering." (Defs.' 56.1, Dkt. 74-8, ¶ 68.) On May 16, 2008, Plaintiff wrote to RSD Engineering principal Richard Donald:

> Dear Sir, It was nice speaking with you, this afternoon. Again, thanks for the job offer to me. I delayed in giving you the response as I went to my Attorney this afternoon to make sure about the conditions on which I could work on my Existing [H-1B] work Visa being issued by the company called Business Integra in Maryland[.] As per my conversation with my attorney the best possible ways are: 1) Instead of you paying me directly for my services, the payment could be given to my company for a few months, [until] I transfer the current [H-1B] to your company[; or] 2) [] you could transfer my [H-1B] right now, and pay directly to me.[13]

(Defs.' 56.1, Dkt. 74-8, ¶ 70; Pl.'s Exs., Dkt. 77-13, at ECF 2616–17.) On May 22, 2008, RSD Engineering wrote back to Plaintiff to explain that it would agree to remit his salary to BI so long as BI sent it a letter authorizing as much. (Defs.' 56.1, Dkt. 74-8, ¶ 71.) Plaintiff subsequently worked at RSD Engineering for one day. (*Id.* ¶ 72.)[14] Additionally, for approximately one month, starting in December 2008, Plaintiff worked as an AutoCAD draftsman and office assistant for Zoria Construction Corporation in Richmond Hill, New York. (*Id.* ¶ 77.) Plaintiff did so without Defendants' knowledge and received pay stubs for the time he worked there. (*Id.*)

---

[13] Plaintiff appears to have been under the impression that he could have his H-1B visa transferred from BI to RSD Engineering. (Pl.'s Dep., Dkt. 77-1, at ECF 2198.) However, a non-citizen cannot transfer his or her H-1B visa from one employer to another. Rather, when a non-citizen starts a new job on an employment-based visa, the H-1B application process starts anew and the *new employer* must file the H-1B petition on the non-citizen's behalf. *See* 8 U.S.C. § 1184(n)(1); *Burrell*, 995 F. Supp. at 403 n.2.

[14] There is nothing in the record indicating whether Plaintiff was paid by RSD Engineering for that one day of work or whether Plaintiff ever provided information to RSD Engineering to facilitate payment to BI on Plaintiff's behalf.

In February of 2009, Plaintiff was informed that BI would be terminating his H-1B visa. (*Id.* ¶ 78.) In response, Plaintiff asked BI for pay stubs, of which there were none. (*Id.* ¶¶ 79–81; Pl.'s Dep., Dkt. 77-1, at ECF 2194–95.)[15] BI terminated Plaintiff's H-1B visa on November 2, 2009. (Defs.' 56.1, Dkt. 74-8, ¶ 86.) On March 18, 2015, Plaintiff sent a letter to the Department of Labor in which he alleged that BI had violated immigration law. (*Id.* ¶ 92; Defs.' Ex. U, Dkt. 74-6, at ECF 1573–75.) On July 7, 2015, the Department of Labor sent a response to Plaintiff explaining that the conduct of which Plaintiff complained was not unlawful because any claims arising therefrom were time-barred. (Defs.' 56.1, Dkt. 74-8, ¶ 92; Defs.' Ex. V, at ECF 1577.)

Plaintiff then commenced the instant litigation on August 10, 2015 and filed an amended complaint on November 16, 2015, alleging a variety of state law claims as well as federal claims against Defendants under §§ 1589, 1592, 1593A,[16] and 1595 of the Trafficking Victims Protection Reauthorization Act ("TVPRA"). (Defs.' 56.1, Dkt. 74-8, ¶ 93; Am. Compl., Dkt. 11 ¶¶ 46–53.)[17] Defendants filed a motion for summary judgment (Dkt. 74), as well as a motion for sanctions against Plaintiff for abuse of the discovery process (Dkt. 75). Additionally, both Plaintiff (Dkt. 57) and Defendants (Dkt. 76) filed motions *in limine* to exclude expert testimony adduced by opposing counsel. All four motions are currently before the Court.

---

[15] Plaintiff, in fact, was never paid by BI, since his employment there never formally commenced. (Defs.' 56.1, Dkt. 74-8, ¶ 81; Pl.'s Dep., Dkt. 77-1, at ECF 2194–95.)

[16] Although the amended complaint references 18 U.S.C. § 1593(a), which is the TVPRA provision governing mandatory restitution (Am. Compl., Dkt. 11, at ECF 63, ¶ 52), Plaintiff appears to have intended to bring a claim under 18 U.S.C. § 1593A, which punishes those who "knowingly benefit[], financially or by receiving anything of value, from participation in a venture which has engaged in any act in violation of [the TVPRA], knowing or in reckless disregard of the fact that the venture has engaged in such violation."

[17] The state law claims were dismissed at the pleadings stage. *Saraswat v. Jayaraman*, No. 15-CV-4680 (PKC) (LB), 2016 WL 5408115, at *7 (E.D.N.Y. Sept. 28, 2016).

# DISCUSSION

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). Once this burden is met, however, the burden shifts to the non-moving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence" in support of the non-moving party is insufficient; "there must be evidence on which the jury could reasonably find for the" non-movant. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quotation omitted). In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quotation omitted).

When assessing whether a genuine issue of fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). The Court also construes any disputed facts in the light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970). However, "the mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48.

## I. Defendants' Motion for Summary Judgment

Plaintiff's claims against Defendants arise under the TVPRA, which, *inter alia*, makes it unlawful to "knowingly provide[] or obtain[] the labor or services of a person" using "threats of serious harm to that person," "the abuse or threatened abuse of law or legal process," or "any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person . . . would suffer serious harm . . . ." 18 U.S.C. § 1589(a). In addition, the TVPRA punishes those who "knowingly . . . confiscate[] or possess[] any actual or purported passport or other immigration document, . . . in the course of a violation of [18 U.S.C. § 1589]; or with intent to violate [that provision] . . . ." 18 U.S.C. § 1592(a). Moreover, the TVPRA imposes liability on those who "knowingly benefit[], financially or by receiving anything of value, from participation in a venture which has engaged in any act in violation of [18 U.S.C. § 1592]," if they did so "knowing or in reckless disregard of the fact that the venture ha[d] engaged in such violation." 18 U.S.C. § 1593A. The TVPRA also criminalizes attempts to violate 18 U.S.C. §§ 1581, 1583, 1584, 1589, or 1590, as well as conspiracies to violate 18 U.S.C. §§ 1581, 1583, 1589, 1590, or 1592. 18 U.S.C. § 1594(a)–(b). Finally, § 1595 creates a civil cause of action for violations of the TVPRA. 18 U.S.C. § 1595 (permitting victims to "bring a civil action against" violators of the TVPRA to "recover damages and reasonable attorneys['] fees").

### A. Forced Labor Under § 1589

Civil liability for forced labor under § 1589 requires a finding, by a preponderance of the evidence, that the defendant "knowingly provide[d] or obtain[ed] the labor or services of a person" by means of: (1) force, threats of force, physical restraint, or threats of physical restraint to that

person or another person;[18] (2) serious harm or threats of serious harm to that person or another person; (3) the abuse or threatened abuse of law or legal process; or (4) any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint. 18 U.S.C. § 1589(a). As discussed *infra*, "serious harm" includes "psychological, financial, or reputational harm." 18 U.S.C. § 1589(c)(2).

### 1.   Plaintiff Did Not Perform "Labor" or "Services" for Defendants

Plaintiff has failed to present evidence from which a reasonable trier of fact could conclude that he engaged in "labor" or "services" for Defendants within the meaning of § 1589. For purposes of § 1589, the Second Circuit has defined "labor" as "the expenditure of physical or mental effort especially when fatiguing, difficult, or compulsory" and "service" as "the performance of work commanded or paid for by another." *United States v. Marcus*, 628 F.3d 36, 44 n.10 (2d Cir. 2010) (quoting *Merriam-Webster's Third New International Dictionary Unabridged* (2002)). Although Plaintiff's allegations that he was forced "to find another job [as to which] any potential employer [would have to] pay 30% of [Plaintiff's] earnings to [BI], and that Plaintiff's H[-]1B [visa] would remain under [BI's] control" in the meantime (Am. Compl., Dkt. 11, ¶ 15) were sufficient to state a forced labor claim at the motion-to-dismiss stage, *Saraswat*, 2016 WL 5408115, at *4, discovery has not sufficiently substantiated these allegations to enable Plaintiff's forced labor claim to survive summary judgment.

Instead, discovery revealed the following. Defendant Parathasarthy sent engineering job openings to Plaintiff and suggested that Plaintiff apply to them so that he could gain experience in

---

[18] In discovery, Plaintiff conceded that Defendants never threatened him with physical harm. (Defs.' 56.1, Dkt. 74-8, ¶ 94.; Pl.'s Dep., Dkt. 77-1, at ECF 2210.)

advance of his H-1B permit approval. (Defs.' 56.1, Dkt. 74-8, ¶ 37.) While Plaintiff was looking for a job, he was also under the impression that BI was looking for an OPT/CPT placement for him as well. (*Id.* ¶ 38.) When BI presented Plaintiff with a mechanical engineering position in Illinois, Plaintiff declined. (*Id.* ¶ 40.) Subsequently, BI presented Plaintiff with an engineering analyst position in Wisconsin. (*Id.*) Additionally, although BI asked Plaintiff to find jobs that BI could pursue on Plaintiff's behalf, when Plaintiff did find jobs, he did not forward them to BI. (*Id.* ¶ 41.) For example, Plaintiff found a job with Zoria Construction Corporation and worked there for a month and was paid, but never informed Defendants. (*Id.* ¶ 77.) And although Plaintiff received an offer to work at RSD Engineering, he worked there for only one day and there is no evidence that any payments from RSD Engineering were ever remitted to BI, despite the fact that RSD Engineering agreed to pay BI for Plaintiff's work. (*Id.* ¶¶ 70–73; Pl.'s Exs., Dkt. 77-13, at ECF 2616–17.)

This evidence is insufficient to support a finding that Plaintiff engaged in "labor" or "services" for Defendants within the meaning of § 1589. First, the evidence shows that Plaintiff actually *declined* a job opportunity during the time in which Defendants were allegedly forcing him to find employment. (Defs.' 56.1, Dkt. 74-8, ¶ 40.) Second, with respect to the only form of labor sufficiently stated in the complaint, *Saraswat*, 2016 WL 5408115, at *4 —*i.e.*, the effort to find jobs for which BI could receive a 30% share of the bill rate—the evidence shows that any such efforts by Plaintiff were not made for BI's benefit, but solely for his own, and that Plaintiff, in fact, worked at two jobs without informing BI and/or giving any of his earnings from those jobs to BI. (Defs.' 56.1, Dkt. 74-8, ¶¶ 72, 77.)

Accordingly, Plaintiff's forced labor claim must be dismissed based on his inability to show that he actually engaged in "labor" or "services" for Defendants or from which Defendants benefitted.

2. Defendants Did Not Threaten Plaintiff with Serious Harm, or Abuse, or Threaten to Abuse, the Legal Process

Plaintiff's forced labor claim also fails because the evidence is insufficient to demonstrate the compulsion aspect of the claim, namely, that Defendants either threatened Plaintiff with serious harm, or abused, or threatened to abuse, the law or legal process.

The TVPRA defines "serious harm" as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2); *see also Guobadia v. Irowa*, 103 F. Supp. 3d 325, 334 (E.D.N.Y. 2015). The TVPRA defines "abuse or threatened abuse of law or legal process" as "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure" on the victim to take or refrain from taking some action. § 1589(c)(1); *see Guobadia*, 107 F. Supp. 3d at 334 (defining "[a]buse of the law or legal process" as the "use of threats of legal action, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed in order to coerce someone into working against that person's will" (quoting *Shukla v. Sharma*, No. 07-CV-2972 (CBA) (CLP), 2012 WL 481796, at *2 (E.D.N.Y. Feb. 14, 2012))).

Plaintiff contends that Defendants threatened him with deportation. Specifically, in his deposition, Plaintiff stated that Selva Jayaraman—then the Chief Technology Officer of BI (Jayaraman Dep., Dkt. 77-3, at ECF 2257)—made "[t]hreats of deportation and termination and

cancellation of H-1Bs" in 2010. (Pl.'s Dep., Dkt. 77-1, at ECF 2210.) Plaintiff also stated that Defendant Parathasarthy threatened him "in a more polite way" with termination "because [Plaintiff] was not able to find a job." (*Id.*)[19] Even assuming *arguendo* that Plaintiff's account, standing alone, is sufficient to create a disputed issue of fact, this evidence is still insufficient to establish a forced labor claim, when considered under the totality of the circumstances. *See Guobadia*, 103 F. Supp. 3d at 335 (observing that while "the threat of being forced to leave the United States can constitute serious harm to an immigrant within the meaning of § 1589," in determining whether serious harm was caused or threatened, "the evidence must be considered under the totality of the circumstances" (quotation and brackets omitted)).

    a.  <u>Serious Harm</u>

Plaintiff cannot demonstrate that Defendants threatened serious harm as contemplated under § 1589 because the consequences that Defendants warned Plaintiff about, *i.e.*, termination of Plaintiff's H-1B visa and deportation, were not used to compel him to perform work for Defendants, but rather were accurate statements about the consequences of Plaintiff's failure to fulfill his obligations under the H-1B Contract that he voluntarily entered into with Defendants.

Here, the undisputed evidence shows that Plaintiff voluntarily entered into two separate contracts with Defendants, both involving Plaintiff's agreement to work at different companies for both parties' financial benefit. Under the first contract, the OPT Contract, the parties agreed to a 70/30 split of Plaintiff's earnings performed at BI's "customer sites." (Defs.' 56.1, Dkt. 74-8, ¶¶ 25–26; Pl.'s Exs., Dkt. 77-5, at ECF 2426.) Under the second contract, the H-1B Contract, entered into after Plaintiff had obtained the H-1B visa sponsored by BI, Plaintiff agreed to work

_____

[19] Defendants dispute that the threats and statements attributed to Mr. Jayaraman and Defendant Parathasarthy were ever made. (Defs. 56.1, Dkt. 74-8, ¶¶ 89–91.)

for BI as a mechanical engineer, on an "at-will basis," at BI's Greenbelt, Maryland division, though still being assigned to client sites, for an annual salary of $55,000. (Defs.' 56.1, Dkt. 74-8, ¶¶ 49-52, 54-55; Pl.'s Exs., Dkt. 77-5, at ECF 2430.) Furthermore, the H-1B Contract also allowed Plaintiff to secure consulting assignments on his own, but in that instance, Plaintiff would be paid "75% of his[] billed amount as [his] total compensation[]" for the year instead of his salary of $55,000 (Defs' 56.1, Dkt. 74-8, ¶ 59; Pl.'s Exs., Dkt. 77-5, at ECF 2431.) Eventually, in November 2009, after Plaintiff had failed, over the course of almost two years, to perform any work for BI, and after Plaintiff told BI in November 2007 that he was "leaving Maryland" with an expected return in the spring of 2008, BI terminated Plaintiff's H-1B visa. (Defs.' 56.1, Dkt. 74-8, ¶ 86.)

These undisputed facts show that Defendants did not threaten Plaintiff with "serious harm" that is actionable under § 1589; rather, any "threat" of deportation—assuming *arguendo* that Plaintiff's statement is sufficient to create a factual dispute—was an accurate statement of what could happen to Plaintiff if he did not perform his obligations under the H-1B Contract and if BI, as the sponsor of Plaintiff's H-1B visa, then terminated it. As explained, *supra*, the H-1B Contract expressly stated the following:

> H-1B approval: You understand and acknowledge that your employment by Business Integra may commence once your H[-]1B petition is filed. You further understand and acknowledge that if your H-1B petition is denied, then, under the law, your work authorization ceases and you are required to depart the United States. As such, your future employment by Business Integra is subject to the final approval of your H-1B petition and such employment with Business Integra must be terminated upon the denial of your petition.

(Pl.'s Exs., Dkt. 77-5, at ECF 2427.) Indeed, Plaintiff appears to have understood that the H-1B Contract provided for BI to maintain control of Plaintiff's visa to ensure that any work he performed for BI was lawfully done. (Defs.' Ex. K, Dkt. 74-5, at ECF 1521–23; Defs.' 56.1, Dkt. 74-8, ¶ 48.)

For the same reasons, Plaintiff cannot demonstrate "that the work he was made to perform transcended the satisfaction of his legitimate job duties, which may have been necessary to maintain his eligibility for an H-1B visa." *Walia v. Veritas Healthcare Sols.*, No. 13-CV-6935 (KPF), 2015 WL 4743542, at *4 (S.D.N.Y. Aug. 11, 2015) (citation omitted). Although, as the Court has found, Plaintiff did not actually perform any work for Defendants, had he looked for and/or worked at jobs he found on his own, or had he worked at jobs found for him by BI, that work would have been no more than what he was required to do under the H-1B Contract, which Plaintiff voluntarily entered into with BI.

Thus, to the extent Defendants informed Plaintiff that revocation of his H-1B visa—an option that Defendants were permitted to exercise under the at-will employment contract entered into between the parties (*see* Defs.' Ex. K, Dkt. 74-5, at ECF 1520–21)—could result in deportation, warning of such a consequence was not "a 'threat' [] under the [TVPRA]." *Headley v. Church Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012). Rather, the possibility of deportation was an "adverse but legitimate consequence[]" of Plaintiff's terms of employment with BI, *id.*, and informing Plaintiff that such an outcome could result was not "force" or "coercion" as contemplated by the TVPRA.

Furthermore, Plaintiff's testimony and conduct belie any claim that he, in fact, felt threatened by the prospect of deportation if he failed to provide labor or services for BI. Plaintiff concedes that he signed both the H-1B and OPT Contracts with BI voluntarily and that he did not feel that he was being forced to agree to their terms. (Defs.' 56.1, Dkt. 74-8, ¶¶ 29, 31; Pl.'s Dep., Dkt. 77-1, at ECF 2158–59, 2184–85.) After signing the H-1B Contract, Plaintiff never reported to BI's Greenbelt office, refused to accept the one job opportunity brought to him by BI, and worked for at least one separate employer without notifying BI and/or paying BI any share of his

earnings. (Defs.' 56.1, Dkt. 74-8, ¶¶ 40, 61, 77.) It is also undisputed that, throughout the relevant period from 2007 to 2010, Plaintiff lived with and was supported by his family at his family's house in Queens, New York. (*Id.* ¶ 95.) During this period, Plaintiff possessed his passport at all times. (*Id.* ¶ 96.) Additionally, discovery revealed that, as of his deposition, Plaintiff had not looked for work since 2014 and continued to receive financial support from his family. (*Id.* ¶ 97; Pl.'s Dep., Dkt. 77-1, at ECF 2134.)

Lastly, the consequences of any threatened deportation to Plaintiff do not meet the standard of "serious harm" under the TVPRA. At his deposition, Plaintiff testified about the consequences of his returning to India:

> I could [return to India for a job], but there is one problem with that. My family ties. My family—none of my immediate family lives there anymore. My sister, both of them, they live here [in the United States]. My parents are old, they also come here. [My sister], she doesn't live in India, sort of like the family is here, or I would have gone long back had the family [not] been here. The family ties are very important. . . . The reason for me not to go [back to India], if you look at my education credentials, I have earned my FAA aviation license here, that's not valid in India. That's not valid in India. [The] Indian government ha[s] their own license, you have to again work on that, you have to gain the experience, do it, you start to work, no matter [that] you are here or [even work for] NASA here. When you go back there, it's not activated. So, the education goes into wane. Third thing, I'm now asthmatic. Sorry to say, but New Delhi air is like a little bit polluted. Fourth thing, I mean, even if like my Ph.D. is not completed yet. If I leave a Ph.D. here, then again, it's a waste of my time, you know. I have taken—but I'm not taking any courses right now because of the litigation, like I said earlier. But I mean, it would be like when I came here, then it would have been a mistake. And if I go like that, I mean, then again, I would be like nowhere, no man's land, you know. So, what would I gain, you know? It's not that, that I don't want to work. What do you mean? I'm sorry to say, I mean, I did all this education to put in my pocket and just go out and smoke cigarettes? No. I wanted to do something good, I could not, unfortunately.

(Pl.'s Dep., Dkt. 77-1, at ECF 2224–25.)

That Plaintiff may have had to return to India—where he would be away from his family, under-employed, exposed to air that he felt was a "little bit polluted," and unable to complete his desired Ph.D. program—fails to rise to the level of "serious harm" under the standard articulated

by the Second Circuit in *United States v. Rivera*, 799 F.3d 180 (2d Cir. 2015). *See Hongxia Wang v. Enlander*, No. 17-CV-4932 (LGS), 2018 WL 1276854, at *5 (S.D.N.Y. Mar. 6, 2018) (stating that in determining "whether an employer's conduct was sufficiently serious to coerce a plaintiff to provide labor against her will, the Second Circuit applies a 'hybrid standard[,]'" pursuant to which the factfinder should "consider the particular vulnerabilities of the person in the [plaintiff's] position" and consider whether "[the plaintiff's] acquiescence [to the defendant's demands would] be objectively reasonable under the circumstances" (quoting *Rivera*, 799 F.3d at 186–87)); *cf. id.* (holding that employer's conduct was sufficiently serious to state a claim under § 1589 where "[t]he Complaint allege[d] that Defendant coerced Plaintiff to work for him from 2006 to 2011, principally through physical violence and threats of physical violence, including sexual assault and rape"); *Walia*, 2015 WL 4743542, at *4 (denying motion to dismiss claims of involuntary servitude and forced labor where the complaint alleged that the plaintiff was "threatened, mentally tortured, and stalked and under constant threat of his life" (quotations and brackets omitted)).

In sum, viewing all of the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, the Court determines that no reasonable trier of fact could find that Defendants threatened Plaintiff with "serious harm" as defined by the TVPRA. *See Bauer v. Yellen*, 548 F. Supp. 2d 88, 92 (S.D.N.Y. 2008) ("In reviewing a motion for summary judgment, the court must conduct a search of the record, and grant or deny summary judgment as the record indicates." (citing Fed. R. Civ. P. 56(c))).

### b. Abuse, or Threatened Abuse, of Legal Process

Plaintiff also argues that Defendants' alleged threats to deport him constituted an abuse, or threatened abuse, of the legal process. (Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp."), Dkt. 78, at ECF 2689–2701.) For largely the same

reasons discussed above with respect to the serious harm element, this claim too fails. First, the evidence is insufficient to establish that Defendants used the possibility of deportation to compel him to perform labor or services for BI. Rather, the H-1B Contract informed Plaintiff of the legal consequence of his H-1B visa being terminated for his failure to obtain one. Second, the undisputed evidence shows that Plaintiff did not feel threatened or compelled to engage in work for BI based on the threat of deportation. Third, Plaintiff voluntarily entered into the H-1B Contract, which conditioned Plaintiff's employment with BI upon his obtaining an H-1B visa and allowed BI to terminate the contract (and Plaintiff's H-1B visa) unilaterally.

Based on the undisputed facts, Defendants' conduct did not constitute an abuse of the law or legal process for purposes of § 1589, which prohibits Defendants' use of the law in a manner for which it was not designed, in order to exert pressure on the victim to take action or refrain from taking action. 18 U.S.C. § 1589(c)(1). Here, Defendants used the H-1B visa process for the purpose for which it was intended, namely, to obtain legal authorization for Plaintiff to work in a "specialty occupation" for BI. 8 C.F.R. § 214.2(h)(1)(ii)(B)(1). That Defendants chose to terminate Plaintiff's H-1B visa after he failed to perform any work under the H-1B Contract was not an abuse of the legal process; Defendants were simply exercising their contractual rights and their rights under the immigration laws to terminate the H-1B visa that they had sponsored. That Plaintiff may have mistakenly believed that Defendants were abusing their legal authority by maintaining control of, and terminating, Plaintiff's H-1B visa, does not go to Defendants' intent nor the lawfulness or unlawfulness of their conduct.

Indeed, the evidence that directly shows that Defendants did not intend to abuse, and did not abuse, the legal process with respect to Plaintiff's H-1B visa is the contract that he signed, the H-1B Contract, which clearly stated that in order for Plaintiff to legally work for BI, he must obtain

an H-1B visa.[20] Thus, it was not an "abuse of law or legal process" for BI, as Plaintiff's sponsoring employer: (1) to maintain control of Plaintiff's H-1B visa during the period that the H-1B Contract was in effect; (2) not to transfer Plaintiff's H-1B visa to another employer so that Plaintiff could work for that employer; or (3) to terminate Plaintiff's H-1B visa in November 2009 after Plaintiff had failed to do any work for BI under the H-1B Contract.

*   *   *

Based on the foregoing, the Court concludes that no reasonable trier of fact could find that Plaintiff has established Defendants' liability for forced labor under § 1589. *Cf. Javier v. Beck*, No. 13-CV-2926 (WHP), 2014 WL 3058456, at *6 (S.D.N.Y. July 3, 2014) (holding that the plaintiff had sufficiently stated a forced labor claim where he "allege[d] that [the d]efendants promised him a job as a physical therapy rehab manager paying $35.53 per hour, then threatened to withdraw his visa application if he did not report to other jobs where he effectively earned $15 an hour"); *Guobadia*, 103 F. Supp. 3d at 331 (denying the defendants' summary judgment motion on forced labor claim where plaintiff presented evidence that "[a]t [a defendant's] instruction, the [p]laintiff provided her . . . wages directly to [a defendant], who deposited the checks into [the defendant's] own account").

### B.      Attempted Forced Labor Under § 1594(a)

Section 1594(a) provides that "[w]hoever attempts to violate [the prohibitions on peonage, enticement into slavery, and forced labor, among other offenses] shall be punishable in the same

---

[20] Although it is unclear whether BI could lawfully permit or request Plaintiff to work for other companies—even if they were BI's "customers"—pursuant to the H-1B visa BI had sponsored, *Burrell v. City Univ. of N.Y.*, 995 F. Supp. 398, 403 n.2 (S.D.N.Y. 1998), any illegality or impropriety associated with that conduct was not used to compel Plaintiff to perform labor or services for BI. In fact, it had the opposite purpose and effect by giving Plaintiff the option of working for *other* employers he found on his own (even though that employment may have exceeded the scope of Plaintiff's H-1B visa).

manner as a completed violation of that [crime]." 18 U.S.C. § 1594(a). To prevail on a claim of attempted forced labor under § 1594(a), Plaintiff must demonstrate that Defendants "had the intent to commit the underlying crime" of attempted forced labor. *Stein v. World-Wide Plumbing Supply Inc.*, 71 F. Supp. 3d 320, 330 (E.D.N.Y. 2014). "A conviction for attempt," in turn, "requires proof that a defendant (a) had the intent to commit the object crime and (b) engaged in conduct amounting to a substantial step towards its commission." *United States v. Farhane*, 634 F.3d 127, 145 (2d Cir. 2011).

Discovery has not substantiated the factual allegations that Plaintiff made in his amended complaint with respect to the attempted forced labor claim. Plaintiff alleged that BI "requested that [Plaintiff] provide a check in the amount of $2,000 as payment" for filing an H-1B visa application for him (Am. Compl., Dkt. 11, ¶ 13); that, rather than following through on their promise to employ Plaintiff directly as a mechanical engineer, Defendants "told [Plaintiff] that he needed to find another job but that any potential employer must pay 30% of [Plaintiff's] earnings to [BI]" (*id* ¶ 15); "that [Plaintiff's] H[-]1B would remain under [BI's] control" (*id.*); and that Defendants "threatened to revoke [Plaintiff's] visa (which would compromise [Plaintiff's] legal status in the United States) if he did not find outside employment immediately" (*id.* ¶ 18). However, as the Court has explained, *supra*, Defendants never attempted to use the $2,000 security deposit to coerce Plaintiff to perform any work. (Defs.' 56.1, Dkt. 74-8, ¶ 35.)

Moreover, Plaintiff signed the OPT Contract establishing the 70/30 split of his own free will and has presented no evidence suggesting that Defendants forced him to do so. (*Id.* ¶¶ 23, 48.) And while Plaintiff may have believed that he could not obtain other employment in May of 2008 unless BI agreed to transfer his H-1B, this belief is irrelevant with respect to Defendants' intent or beliefs. (*Id.* ¶ 70; Pl.'s Exs., Dkt. 77-13, at ECF 2616–17.) Moreover, to the extent

Plaintiff was under the impression that he was unable to work for a different employer until BI surrendered Plaintiff's H-1B visa over to him, he was mistaken. As the Court has explained, *supra*, a non-citizen cannot "transfer" his or her H-1B visa from one employer to another. Rather, when a non-citizen starts a new job on an employment-based visa, the H-1B application process starts anew and the *new employer* must file the H-1B petition on the non-citizen's behalf. *See* 8 U.S.C. § 1184(n)(1). As one court has explained,

> An 'H-1' visa is granted by the [Immigration and Naturalization Service ("INS")], upon petition by a prospective employer, to non-immigrants who are to be brought into the United States by the prospective employer to perform, *inter alia*, 'specialty occupations,' as that term is defined in § 214(i)(1) [of] the Immigration and Naturalization Act, codified at 8 U.S.C. §1184. The employee may not use the visa to work for other employers. 8 C.F.R. § 214.2(h)(2)(i)(D). If an employee seeks additional employment after working for the authorized employer, the new employer must petition the INS to sponsor a transfer of the employee's visa.

*Burrell*, 995 F. Supp. at 403 n.2.

Accordingly, the Court concludes that there is insufficient evidence in the record upon which a reasonable jury could find that Defendants possessed the requisite level of intent to violate the TVPRA in order to establish an attempted forced labor claim. *Farhane*, 634 F.3d at 145.

## C.     Document Servitude Under § 1592

Section 1592 provides for liability for any person who "knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person" in connection with a violation of the TVPRA. 18 U.S.C. § 1592(a). Plaintiff alleges four instances of document servitude in violation of § 1592 of the TVPRA: (1) Defendants wrongfully withheld Plaintiff's visa for six months between October 2007 and March 2008 (Am. Compl., Dkt. 11, ¶ 14); (2) Defendants refused to transfer Plaintiff's H-1B visa to Caterpillar/Voltservices from November 2007 until March 2008 (*id.* ¶ 19); (3) Defendants refused to transfer Plaintiff's

visa to RSD Engineering, another prospective new employer for Plaintiff, in March 2008 (*id.* ¶ 20); and (4) Defendants refused to give Plaintiff pay stubs unless he paid an extortionate sum of $15,000 in February 2010 (*id.* ¶ 23).

The Court grants summary judgment to Defendants on all of the document servitude claims. Because the first three instances in which Plaintiff alleges Defendants unlawfully confiscated Plaintiff's documents took place before December 23, 2008, any civil claims arising under § 1592 based on these incidents are time barred. "There was no private right of action under section 1592 prior to 2008." *Oak-Jin Oh. v. Soo Bok Choi*, No. 11-CV-3764 (DLI) (MDG), 2016 WL 11430442, at *7 (E.D.N.Y. Feb. 29, 2016); *see also Tanedo v. E. Baton Rouge Parish Sch. Bd.*, No. 10-CV-1172 (JAK), 2012 WL 5378742, at *8 (C.D. Cal. Aug. 27, 2012) ("[T]here was no civil remedy for document servitude, whether directly through § 1592 or indirectly through § 1590, before December 23, 2008. [The p]laintiffs cannot base their § 1592 claims on any document servitude occurring before December 23, 2008."). Furthermore, with respect to Plaintiff's second and third claims, alleging the failure to transfer his H-1B visa to other employers, those claims would fail on the additional basis that, as previously discussed, a non-citizen cannot "transfer" his or her H-1B visa from one employer to another, but must begin the H-1B application process anew with the new employer filing the H-1B petition on the non-citizen's behalf. *See* 8 U.S.C. § 1184(n)(1); *Burrell*, 995 F. Supp. at 403 n.2. As for the alleged extortion of $15,000 from Plaintiff by Defendants, Plaintiff never presented any evidence in discovery substantiating this factual allegation,[21] and so the Court will not accept it as true for the purposes of summary judgment. *See Realtime Data, LLC v. Stanley*, 897 F. Supp. 2d 146, 159–60 (S.D.N.Y. 2012)

---

[21] In fact, as discussed *supra*, BI had no pay stubs for Plaintiff because he never performed any work for the company. (Defs.' 56.1, Dkt. 74-8, ¶ 81; Pl.'s Dep., Dkt 77-1, at ECF 2194–95.)

(refusing to accept an "unsupported factual assertion" because "[a]t the summary judgment stage, more is required").

## II.     Defendants' Motion for Sanctions

In addition to summary judgment, Defendants seek sanctions against Plaintiff (not his counsel) for abuse of the discovery process. (Defendants' Motion for Sanctions, Dkt. 75.) Specifically, Defendants seek

> an order pursuant to [Federal Rules of Civil Procedure] 35[ and] 37 and the court's inherent powers to issue sanctions, sanctioning Plaintiff, Ajay Saraswat, for videotaping a Rule 35 Examination which was outside the scope set forth in the Court Order dated August 30, 2017[,] by: a) excluding the introduction of any videotape of the Rule 35 Examination; b) excluding any questioning of Roy Lubit based upon any information procured as a result of any videotaping of the Rule 35 Examination; c) excluding the deposition transcript of Roy Lubit from use at the time of trial or in any proceeding on this matter; [and] d) the assessment of attorneys' fees and costs associated with this application.

(*Id.* at ECF 1676.)

The Court has discretion in deciding whether to grant sanctions based on the foregoing allegations. "[I]t is clear that sanctions may be imposed upon a party or counsel who deliberately fails to comply with a court order." *Martinez v. City of New York*, No. 16-CV-79 (AMD) (CLP), 2019 WL 1246509, at *2 (E.D.N.Y. Mar. 18, 2019); *see World Wide Polymers, Inc. v. Shinkong Synthetic Fibers, Corp.*, 694 F.3d 155, 158 (2d Cir. 2012) ("Federal Rule of Civil Procedure 37 governs the district court's procedures for enforcing discovery orders and imposing sanctions for misconduct."). Under Rule 37, "[i]f a party . . . fails to obey an order to provide or permit discovery, including an order under [Rules] 26(f), 35, or 37(a), the court where the action is pending may issue further just orders" that may include, *inter alia*, (1) "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims"; (2) "rendering a default judgment against the disobedient party"; or (3) "treating as contempt of court the failure to obey any order except an order to submit to a

physical or mental examination." Fed. R. Civ. P. 37(b)(2)(A). "Even in the absence of a court order, Rule 37 provides for sanctions where 'a party fails to provide information or identify a witness as required by Rule 26(a) or (e).'" *Martinez*, 2019 WL 1246509, at *2 (quoting Fed. R. Civ. P. 37(c)(1)).

The motion for sanctions is denied. According to Defendants, "[t]he video recording of a Rule 35 Examination must be done with court approval." (Defendants' Memorandum in Support of Defendants' Motion for Sanctions, Dkt. 75-1, at ECF 1685.) Defendants additionally note that courts have sanctioned parties in the past for improperly using recording devices. (*Id.* at ECF 1686.) But none of the decisions cited in support of either of these two propositions are binding on this Court. *See L.S. v. Webloyalty.com, Inc.*, No. 10-CV-1372 (CSH), 2014 WL 3547640, at *5 (D. Conn. July 17, 2014) (noting that the district court is "not bound by the decisions of any other district court in the nation, nor by the decisions of any circuit court other than the Second"). Although the August 30, 2017 Order, issued by the Honorable Lois Bloom, that Defendants reference did not explicitly grant Plaintiff permission to record his Rule 35 Examination, it also did not explicitly prohibit him from doing so. (Dkt. 39, at ECF 262.) Nevertheless, "[c]ourts have generally permitted the tape recording of examinations only where they have held that there is a right to have an attorney present at an examination, or where special circumstances have been shown[,]" *Hirschheimer v. Associated Metals & Minerals Corp.*, No. 94-CV-6155 (JFK), 1995 WL 736901, at *4 (S.D.N.Y. Dec. 12, 1995), which was not the case here. *See Gade v. State Farm Mut. Auto. Ins. Co.*, No. 14-CV-48 (CR), 2015 WL 12964613, at *4 (D. Vt. Jan. 2, 2015) ("The party seeking to record or videotape an examination bears the burden of showing good cause for the request.").

Although the Court disapproves of Plaintiff's conduct in recording the medical examination, it nonetheless declines to issue any sanctions at this time. In imposing sanctions under Rule 37, "courts properly consider various factors, including '(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance.'" *Funk v. Belneftekhim*, 861 F.3d 354, 366 (2d Cir. 2017) (brackets omitted) (quoting *S. New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010)). "The Court must also consider the extent to which the prevailing party has been prejudiced by the [opposing] party's noncompliance, and must ensure that any sanction imposed is just and commensurate with the failure to comply." *Doug's World Clocks.Com Pty Ltd. v. Princess Int'l, Inc.*, 323 F.R.D. 167, 174 (S.D.N.Y. 2017) (citation and quotation omitted). There is no evidence before the Court to suggest that Plaintiff was aware that his recording of the Rule 35 Examination was unlawful or was ever warned of the consequences of recording the examination. Furthermore, Plaintiff's counsel represented in his opposition brief that the recording was one minute and fifty-two seconds long (Dkt. 80, ¶ 3), which defense counsel did not contest in their reply (Dkt. 75-2). Finally, and most importantly, because the Court has granted summary judgment in Defendants' favor, any potential prejudice to have resulted from Plaintiff's wrongdoing is non-existent. *See Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 349 F. Supp. 3d 298, 300 (S.D.N.Y. 2018) (denying party's motion where it "ha[d] not sufficiently demonstrated that it was prejudiced to justify the sanction it seeks").

Accordingly, Defendants' motion for sanctions is denied.

### III.  Motions *in Limine*

Because the Court has granted summary judgment in Defendants' favor, the pending motions *in limine* (Dkts. 57 & 76) are denied as moot.  *See Harriscom Svenska, AB v. Harris Corp.*, 3 F.3d 576, 581 (2d Cir. 1993) (affirming the denial of a motion *in limine* as moot where the district court had granted summary judgment).

## CONCLUSION

For the reasons stated in this Memorandum & Order, Defendants' motion for summary judgment is granted, Defendants' motion for sanctions is denied, and Plaintiff's and Defendants' respective motions *in limine* are denied as moot.  The Clerk of Court is respectfully directed to enter judgment in Defendants' favor and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: April 25, 2019
      Brooklyn, New York